**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **REBECCA MUSSER,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO.** |
| | § | **3:17-CV-02166-C** |
| **PAUL QUINN COLLEGE,** | § | |
| | § | |
| **Defendant.** | § | |

---

**DEFENDANT'S BRIEF IN SUPPORT OF ITS**
**MOTION FOR SUMMARY JUDGMENT**

---

Respectfully submitted,

**GREENBERG TRAURIG, LLC**

ALICIA SIENNE VOLTMER
Texas Bar No. 00797605
voltmera@gtlaw.com

2200 Ross Avenue, Ste. 5200
Dallas, Texas 75201
Tel.: (214)-665-3600
Fax: (214)-665-3601

**ATTORNEYS FOR DEFENDANT**
**PAUL QUINN COLLEGE**

## <u>TABLE OF CONTENTS</u>

GROUNDS FOR THE REQUESTED RELIEF .................................................................. 1

SUMMARY JUDGMENT EVIDENCE ........................................................................... 1

RELEVANT BACKGROUND FACTS ............................................................................ 2

    1.     A brief history of PQC. .................................................................................. 2

    2.     President Sorrell hires Antwane Owens as the CFO; Owens later decided
he will leave PQC; and PQC begins the search for a new CFO; PQC's
accounting functions to Excellence for Insight while PQC hunts for a
permanent CFO. ............................................................................................ 3

    3.     PQC hires Plaintiff directly and Plaintiff exhibits consistently poor
performance throughout her tenure as an employee. .................................... 5

    4.     Owens obtains President Sorrell's approval to terminate Plaintiff's
employment and advises Plaintiff of her termination effective 12/31/11. ............... 7

    5.     Plaintiff submits a written complaint to President Sorrell accusing Owens
of engaging in various, fraudulent activities. .............................................. 12

    6.     President Sorrell submits Plaintiff's complaint to PQC's Board and places
Plaintiff and Owens on paid administrative leaves of absence pending an
investigation conducted by outside counsel. ............................................... 13

    7.     Owens files a lawsuit against Musser and Musser counterclaims against
Owens. ......................................................................................................... 15

    8.     Owens joins PQC as a defendant in his lawsuit against Musser and PQC
advises Plaintiff that her pending termination is effective August 31, 2014. ........ 15

    9.     Plaintiff never reports the alleged fraud to the government, PQC's auditors
do not cite PQC for grant accounting fraud, and PQC finally hire a new
CFO. ............................................................................................................. 16

    10.    Plaintiff files this lawsuit against PQC alleging FCA retaliation. ......................... 17

ARGUMENT AND AUTHORITIES ........................................................................... 17

    1.     Summary Judgment Standard. ..................................................................... 17

    2.     Applicable Law. ........................................................................................... 18

          a.     PQC's use of prior deposition testimony. .................................... 18

          b.     The FCA. ....................................................................................... 19

    3.     Plaintiff's retaliation claim is barred by the statute of limitations. ......................... 19

    4.     Plaintiff cannot establish *a prima facie* case of retaliation. ................................ 23

          a.     Plaintiff cannot establish that PQC had notice of her alleged fraud
allegations before Owens made the decision to terminate her
employment. ................................................................................... 24

          b.     Plaintiff cannot establish causation. ............................................. 27

5.      PQC can articulate legitimate, non-discriminatory reason(s) for the discharge decision....................................................................................28
6.      Plaintiff cannot establish pretext.........................................................29

CONCLUSION AND PRAYER ........................................................................... 31

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bingham v. Jefferson County*,
    No. 1:11-CV-48, 2013 U.S. Dist. LEXIS 45826 (S.D. Tex. March 1, 2013)..........................19

*Chardon v. Fernandez*,
    454 U.S. 6, 102 S. Ct. 28, 70 L. Ed. 2d 6 (1981)....................................................20

*Diaz v. FRB of Dallas*,
    No. EP-14-CV-227-KC, 2015 U.S. Dist. LEXIS 93791 (S.D. Tex. July 20,
    2015) ...........................................................................................................29, 30

*Garnica v. Zale Lipshy Univ. Hosp.*,
    No. 3:03-CV-0637-P, 2004 U.S. Dist. LEXIS 29028 (N.D. Tex. Feb. 10,
    2004) ........................................................................................................................29

*U.S. ex rel. George v. Bos. Sci. Corp.*,
    864 F. Supp. 2d 597 (S.D. Tex. 2012) ................................................................23

*Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*,
    545 U.S. 409, 125 S. Ct. 2444, 162 L Ed. 2d 390 (2005)......................................19

*Jackson v. Watkins*,
    619 F.3d 463 (5th Cir. 2010) ...............................................................................29

*Jamison v. Fluor Fed. Sols., L.L.C.*,
    No. 3:16-CV-0441-B, 2017 U.S. Dist. LEXIS 118580 (N.D. Tex. July 28,
    2017) .................................................................................................................19, 24

*Kelly v. Dallas County Cmty. Coll. Dist.*,
    No. 3:16-CV-0871-C, 2017 U.S. Dist. LEXIS 215644 (N.D. Tex. July 28,
    2016) (Cummings, J.) ..........................................................................................28

*U.S. ex rel. Ligai v. ETS-Lindgren Inc.*,
    No. H-11-2973, 2014 U.S. Dist. LEXIS 129164 (S.D. Tex. Sept. 16, 2014)..........................23

*Little v. Liquid Air Corp.*,
    37 F.3d 1069 (5th Cir. 1994) (en banc) ..............................................................17

*Machinchick v. PB Power, Inc.*,
    398 F.3d 345 (5th Cir. 2005) ...............................................................................29

*Manning v. Chevron Chem. Co.*,
   332 F.3d 874 (5th Cir. 2003) ...................................................................26, 27

*Mire v. Tex. Plumbing Supply Co.*,
   286 Fed. Appx. 138 (5th Cir. July 10, 2008) (unpublished)................................30

*U.S. ex rel. Phillips v. L-3 Communs. Integrated, Sys., L.P.*,
   No. 3:10-CV-1784-L, 2012 U.S. Dist. LEXIS 121272 (N.D. Tex. Aug. 24,
   2012) ..........................................................................................................23, 24

*Robertson v. Bell Helicopter Textron, Inc.*,
   32 F.3d 948 (5th Cir. 1994) ...........................................................19, 23, 24

*Ross v. Bob Dean Enters.*,
   No. 10-287 Section "G" (3), 2013 U.S. Dist. LEXIS 12486 (E.D. La. Jan. 30,
   2013) .............................................................................................................19

*Runge v. Stanley Fastening Sys., L.P.*,
   No. 4:09-CV-00130-TWP-WGH, 2011 U.S. Dist. LEXIS 147924 (S.D. Ind.
   Dec. 23, 2011)...............................................................................................18

*U.S. ex rel. Ruscher v. Omnicare, Inc.*,
   No. 4:08-CV-3396, 2014 U.S. Dist. LEXIS 79885 (S.D. Tex. June 12, 2014)......................24

*Shockley v. VT. State Colls.*,
   793 F.2d 478 (2d Cir. 1986)..............................................................................21

*Sossamon v. Lone Star State of Tex.*,
   560 F.3d 316 (5th Cir. 2009) ............................................................................17

*Turner v. Baylor Richardson Med. Ctr.*,
   476 F.3d 337 (5th Cir. 2007) ............................................................................28

*U.S. v. Solvay Pharms., Inc.*,
   871 F.3d 318 (5th Cir. 2017) ............................................................................23

*Valdez v. San Antonio Chamber of Commerce*,
   974 F.2d 592 (5th Cir. 1992) ............................................................................28

*Waggoner v. City of Garland*,
   987 F. 2d 1160 (5th Cir. 1993) .........................................................................29

*Weslowski v. Zugibe*,
   14 F. Supp. 3d 295 (S.D.N.Y. 2014)...........................................................19, 20

*Wiley v. Am. Elec. Power Serv. Corp.*,
   287 Fed. Appx 335 (5th Cir. July 17, 2008) (unpublished)....................................27

## Statutes

31 U.S.C. § 3729 ..............................................................................................1

31 U.S.C. § 3730(h)(1) ....................................................................................19

31 U.S.C. § 3730(h)(3) ....................................................................................19

**Other Authorities**

Fed. R. Civ. P. 56 ................................................................................................................18

Fed. R. Civ. P. 56(c) ...........................................................................................................17

Fed. R. Civ. P. 56(c)(2) .......................................................................................................18

Defendant Paul Quinn College ("PQC" or "Defendant") asks the Court to enter an order granting summary judgment on Plaintiff Rebecca Musser's ("Plaintiff's") sole claim for retaliation under the federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq*., and in support shows as follows:

## GROUNDS FOR THE REQUESTED RELIEF

In this FCA retaliation case, Plaintiff contends PQC unlawfully terminated her employment after she made a complaint of fraudulent activity related to student grant accounting. Plaintiff seeks damages for back pay, special damages, liquidated damages, lost benefits (past and future), mental trauma, and loss of enjoyment of life.[1] PQC moves for summary judgment on the following grounds:

1. Plaintiff's retaliation claim is barred by the FCA's three-year statute of limitations.

2. Even if Plaintiff's retaliation claim were not time-barred, Plaintiff cannot establish a *prima facie* case of retaliation because: (a) she cannot show that PQC had notice of her alleged fraud allegations before PQC made the decision to discharge her; and (b) she cannot establish a causal connection.

3. Even if Plaintiff could establish a *prima facie* case of retaliation, PQC can establish legitimate, non-discriminatory reasons for her discharge.

4. Plaintiff cannot establish pretext.

## SUMMARY JUDGMENT EVIDENCE

In support of this Motion PQC relies on the following evidence:

Exhibit A:  Declaration of Michael J. Sorrell, including exhibits ("Ex. A").

Exhibit B:  Excerpts, including exhibits, from the August 21, 2018 deposition of Michael J. Sorrell ("Ex. B").

Exhibit C:  Excerpts from the January 3, 2014 deposition of Michael Sorrell ("Ex. C").

---

[1] *See* Plaintiff's Complaint at ¶ 15 & § V(a)-(g).

Exhibit D:  Excerpts, including exhibits, from the June 22, 2018 deposition of Plaintiff ("Ex. D").

Exhibit E:  Excerpts from the September 25, 2013 deposition of Plaintiff ("Ex. E").

Exhibit F:  Excerpts from the July 19, 2013 and January 14, 2014 depositions of Antwane Owens ("Ex. F").[2]

Exhibit G:  Excerpts, including exhibits, from the January 6, 2014 deposition of Lori Price ("Ex. G").

Exhibit H:  Excerpts from the January 13, 2014 deposition of Sarah Warland ("Ex. H").

### RELEVANT BACKGROUND FACTS

1.    **A brief history of PQC.**

Founded on April 4, 1872 by a group of African Methodist Episcopal Church preachers in Austin, Texas with the original purpose of educating freed slaves and their offspring, PQC is a private, faith-based, four-year, liberal arts-inspired college located in east Dallas.  Today, PQC proudly educates students of all races and socio-economic classes under its institutional ethos, *WE over Me*.  PQC's operations are overseen and governed by its Board of Trustees ("Board"). Appendix ("App.") at 2 (Ex. A at ¶ 1).

In March 2007, and during a time when PQC was in a time of financial and organization crisis, Michael J. Sorrell ("President Sorrell"), then a Board member, was offered and accepted the position of President of PQC with a mission to turn things around.  App. at 21; 110 (Ex. B at 22:2-22; Ex. C at 10:7-20).  In this role, President Sorrell's job duties are multi-fold.   President Sorrell's duties are multifold. He defines a vision for PQC and leads it in pursuit of excellence in education and to produce the highest quality of graduates; develops long term plans for PQC and develops activities and programs that involve PQC and its students with the surrounding community and city as a whole; raises funds to achieve the many goals of PQC: meets with and

---

[2] Owens' deposition was continued and the pages from both transcripts were consecutively numbered to avoid any confusion.

counsels the students, hears their concerns and inspires them to their best achievements and potential; is the primary emissary of PQC to external groups and local, state, national and international groups and bodies; recruits, evaluates and develops senior administrators and faculty; and maintains a strong relationship and commitment to the Board and carries out its mandates. App. at 2-3 (Ex. A at ¶ 1).

When President Sorrell began his employment as President of PQC, PQC had a Chief Financial Officer ("CFO") who left in about a year. App. at 3 (Ex. A at ¶ 1 ).   President Sorrell created an internal cabinet of employees to advise him, and Lori Price ("Price") served as his Chief of Staff.  App. at 19-20; 60 (Ex. B at 18:20-19:10; 79:12-13).

> **2.**    **President Sorrell hires Antwane Owens as the CFO; Owens later decided he will leave PQC; and PQC begins the search for a new CFO; PQC's accounting functions to Excellence for Insight while PQC hunts for a permanent CFO.**

In or around late 2007 or early 2008, President Sorrell hired Antwane Owens ("Owens"), a Certified Public Accountant and the owner of Excellence for Insight ("EFI"), a strategic consulting company, to act as PQC's CFO and manage and oversee the Financial Office at PQC. President Sorrell had previously worked with Owens on a pro bono project for PQC and was impressed with Owens' deep knowledge of the higher education space through Owens' work with the Boston Consulting Group, which had performed work with other higher education institutions.  App. at 22-27; 451; 164-165; 110-113 (Ex. B at 25:12-26:21; 27:11-14; 28:8-30:10; Ex. F at 7:8-15; Ex. D at 48:1-49:10; Ex. C at 10:10-20; 11:12-12:11).  President Sorrell had trust in Owens' judgment and ability to handle the CFO position.  App. at 28-29; 113; 115 (Ex. B at 31:23-32:1; Ex. C at 18:5-21; 20:9-22).

In February or early March 2010, Owens, through EFI, hired Plaintiff as a contract Controller to work at PQC, and her job duties generally included overseeing the business office,

providing information for grant applications, handling accounts payable, reviewing grant reports, and preparing information for auditors.  App. at 151-161; 421-423; 114 (Ex. D at 34:1-44:7; Ex. E at 41:16-18; 42:16-43:1; Ex. C at 19:3-19).  Plaintiff concedes Owens was a competent CFO and was aware his CFO position was a temporary role until PQC found an acceptable, full-time replacement.  App. at 170-171; 260-262 (Ex. D at 56:10-17; 56:25-57:23, and Dep. Ex. 8).

In late 2010 or early 2011, Owens decided he wanted to leave PQC and return to work for EFI, and PQC began searching for a new, full time CFO to replace him.  Thereafter, Owens knew his role at PQC was temporary and he assisted PQC with the job of finding his permanent replacement.  App. at 458; 118-120 (Ex. F at 239:23-240:7; Ex. C at 27:4-29:8).  In fact, on the assumption PQC would be able to promptly fill the CFO position, which unfortunately did not occur until approximately three years later, PQC held a farewell dinner party for Owens in January 2011.  App. at 69-70; 170-173; 256-259; 3 (Ex. B at 99:23-100:2; Ex. D at 56:8-59:23, and Dep. Ex. 7; Ex. A at  ¶ 8).  From a strategic standpoint, President Sorrell's position was that a new CFO would determine his or her staffing needs and staff the department accordingly.  App. at 120-121 (Ex. C at 29:18-21; 30:1-8).

PQC utilized and continues to utilize the not-for-profit firm of eCratchit ("eCratchit") on a contracting basis to assist with PQC's bookkeeping functions.  Sarah Warland ("Warland") who reported to Ed Muhlherin ("Mulherin"), were eCratchit employees who worked directly with Plaintiff and Owens.  App. at 72-73; 121; 159; 162-163; 171; 169 (Ex. B at 103:11-104:11; Ex. C at 30:9-20; Ex. D at 42:3-9; 46:13-47:14; 57:14-16; 53:5-18).  Plaintiff, who was not a CPA and had failed all of the sections (some repeatedly) on the Certified Public Accountant exam, worked with both Warland and Mulherin in performing her Controller duties for PQC.  App. at  166-169; 177-178; 198; 426-529 (Ex. D at 50:16-20; 51:4-53:18; 72:13-73:3; 105:10-

13; Ex. E at 50:1-51:24). Plaintiff believes both Warland and Mulherin were honest and competent.  App. at 170 (Ex. D at 56:3-9).

PQC receives assistance with student financial aid funding from federal programs including Title III and SAFRA.[3]  App. at 184-185; 47; (Ex. D at 84:7-85:19; Ex. B at 53:16-19). It also utilizes a government grant funding portal known as "G5," which allows participating colleges to draw down on United States Department of Education grant funds after they have made reimbursable expenses.  App. at 168-169; 176-177; 156-157 (Ex. D at 52:17-53:1; 71:17-72:11; 39:19-40:7).[4]  Warland was usually the individual tasked with drawing down grant funds in G5 at the direction of Plaintiff or Owens.  App. at 167-168; 196 (Ex. D at 51:23-52:16; 101:13-19).  Plaintiff had no experience with Title III or SAFRA funds or with the G5 portal prior to her work at PQC.  App. at 168-169; 176-177; 156-157; 177 (Ex. D at 52:17-53:1; 71:17-72:11; 39:19-40:7; 72:21-25)[5].  Similarly, she had no experience with nonprofit higher educational institutions or audits for them prior to her work at PQC.  App. at 149-150 (Ex. D at 29:15-30:13).

### 3.   PQC hires Plaintiff directly and Plaintiff exhibits consistently poor performance throughout her tenure as an employee.

Effective July 1, 2011, PQC hired Plaintiff directly as its Controller although Plaintiff was dissatisfied with her salary and wanted and "expected" to be given the CFO position.  App. at 174-175; 424-425; 116-117 (Ex. D at 65:23-66:25; Ex. E at 47:24-48:3; Ex. C at 21:1-22:15). In this role, Plaintiff continued to report to Owens, the acting CFO.  App. at 434-435 (Ex. E at

---

[3] SAFRA is an acronym for the Student Aid and Fiscal Responsibility Act.

[4] Generally, the process is that a college will make a grant-eligible expenditure and thereafter, meaning in arrears, draw down the funds to cover the expenditure.  App. at 457 (Ex. F at 162:1-163:6).  Plaintiff believed the regulations required the use of federal funds within three days.

[5] Warland is not aware that Owens ever made any representations to the federal government regarding the use of federal funds within three days of the draw.  App. at 479 (Ex. H at 43:17-22).

119:18-120:4).  At the time PQC hired Plaintiff, it had a specific, written policy that required an employee's mandatory reporting of, *inter alia*, "fraudulent claims for federal reimbursement" and "violations of any federal law."  App. at 268-318 (Ex. D, Dep. Ex. 20, at p. 14).  Plaintiff admits she never raised any issues of alleged fraud on the government regarding grant accounting when she became an employee of PQC.  App. at 181-183 (Ex. D at 81:25-83:13).

Not long after Plaintiff began her direct employment with PQC, her performance and attitude declined significantly.  Between September 2011 through early November 2011, Owens repeatedly counseled Plaintiff about, among other things, her inappropriate internal and external e-mails, her failure to supervise an employee in the business office who was submitting inaccurate timesheets, her inability to clearly and concisely explain issues, and her failure to accomplish assigned tasks.  App. at 178-180; 183-184; 188; 191-192; 210-211; 222-223; 319-325; 326-330; 344-348; 455 (Ex. D at 73:16-75:22; 83:14-84:15; 88:6-13; 94:20-95:12; 122:6-123:10; 136:25-137:3, and Dep. Ex. 22, 23, 29, 30, 34, 44; Ex. F at 154:6-12; 155:11-156:9).

Owens reported a number of Plaintiff's performance issues directly to President Sorrell, who also had personally observed Plaintiff's poor judgment and lack of oversight of her direct report.  App. at 36-39; 41-43; 44-53; (Ex. B at 40:8-19; 40:22-41:4; 41:22-43:15; 45:2-18; 45:20-47:5; 50:10-51:16; 51:22-25; 52:8-56:2; 56:13-58:11; 58:24-59:5).

Plaintiff contends that at some unknown point in time, although there is no documentary or other evidence of this until after Owens notified her of her termination on November 16, 2011, she became concerned that Owens was defrauding the government.  App. at 186-188 (Ex. D at 86:17-88:4).  More specifically, even though she acknowledges it was not fraud on the government, she contends Owens deposited Homecoming weekend cash into his personal bank account and then wrote PQC a check to cover the amount he deposited.  App. at 189-191; 366

(Ex. D at 92:3-94:9, and Dep. Ex. 53).  She also contends Owens backdated a vendor check, was "dishonest with Financial Aid," which she could have reported in July 2011 but did not do so, and was not correctly drawing grant funds.  App. at 193-195; 197-199 (Ex. D at 97:9-98:16; 98:19-99:15; 104:12-20; 105:16-106:4).  Notably, Warland, the individual who actually drew down funds from the G5 portal, never told Plaintiff she (Warland) felt she was being asked to violate federal law when drawing down the funds.  App. at 441-442 (Ex. E at 198:25-199:10).

PQC's search for a new, full-time CFO continued through 2011.  App. at 172-173; 241; 263-267 (Ex. D at 58:18-59:11; 165:19-22, and Dep. Ex. 10-11).

### 4.   Owens obtains President Sorrell's approval to terminate Plaintiff's employment and advises Plaintiff of her termination effective 12/31/11.

President Sorrell and Owens attended the Transnational Association of Christian Colleges and Schools ("TRACS") Conference in Nashville, TN between November 9 and 11, 2011, and during the conference, Owens told President Sorrell that Owens wished to terminate Plaintiff's employment because of her numerous instances of substandard performance and behavior. App. at 3; 66-68; 81-83; 454-455 (Ex. A at ¶ 10; Ex. B at 96:16-97:17; 98:21-25; 113:20-115:17; Ex. F at 152:5-10; 154:13-25).

In response, President Sorrell agreed with the termination recommendation, gave Owens approval to execute it, and asked Owens to prepare written documentation to support the decision. App. at 3; 68-70; 93-94 (Ex. A at ¶ 10; Ex. B at 98:21-25; 99:12-100:2; 150:20-151:12). Plaintiff cannot dispute Owens' and President Sorrell's testimony about the decision date because she did not attend the TRACS conference.  App. at 436-437 (Ex. E at 162:24-163:2).  President Sorrell did not require Board or Human Resources approval or authority to approve Plaintiff's discharge. App. at 3; 68-69; 83-84 (Ex. A at ¶ 7; Ex. B at 98:10-25; 99:1-17;

115:18-116:1).    Price  concurred  with  the  conclusion  that  Plaintiff's  work  was  poor  and

inconsistent.  App. at 465; 466-469; 470 (Ex. G at 29:9-16; 32:10-13; 35:6-21; 37:10-13).

On November 10, 2011, Plaintiff sent Owens the following e-mail excerpted below in its

entirety:

> Do we need to back out our AP amounts to Sunguard[6] on the next grant draw,
> since we haven't actually paid them yet?

App. at 331 (Ex. D, Dep. Ex. 38).  Plaintiff begrudgingly concedes she never used any words in

this e-mail to convey her belief that Owens was committing fraud. App. at 191-201; 237-238

(Ex. D at 106:19-108:25; 160:10-161:18).

On November 11, 2011, and in response to President Sorrell's request, Owens submitted

a memo to President Sorrell, written by Owens on that same date, detailing the reasons for

Plaintiff's termination.  App. at 455; 459-460; 55; 56 (Ex. F at 154:13-156:9; 245:13-246:3; Ex.

B at 68:17-20; 70:8-10).  Therein Owens provided no less than ten specific performance issues

with Plaintiff including, *inter alia*, her inability to take direction, her misrepresentation of facts,

her approval of inaccurate time cards, her inability to determine the simple task of calculating the

amount of money needed as funds for Homecoming weekend activities, and her failure to create

policies as directed.  App. at 337-340 (Ex. D, Dep. Ex. 40).

Mindful of PQC's unexpectedly difficult search for a new CFO, Owens also told

President Sorrell, in light of what would be a pending reorganization of the finance department,

"…I have tolerated the substandard performance in the short-term, while we have continued to

search for a replacement CFO.  The intent was to allow the new CFO to hire a replacement,

---

[6] Sunguard was a PQC vendor.  App. at 3 (Ex. A at ¶ 9).

however, the continued deterioration of her performance has necessitated my recommending a more aggressive approach."  App. at 337-340 (Ex. D, Dep. Ex. 40).

Plaintiff concedes Owens did not tell her he had prepared and submitted the termination justification memo to President Sorrell.   App. at 206-207 (Ex. D at 114:10-115:3).   It is undisputed that President Sorrell approved the termination prior to November 16, 2011.  App. at 57 (Ex. B at 74:13-20).

Additionally, on November 11, 2011, Plaintiff claims she texted President Sorrell the following message:

> Can we please make arrangements to meet Monday morning before the staff meeting?  I have some important information that I need to share with you, but do not think it would be in the best interest of the college for me to put in an email. It is my understanding that you are pretty swamped today.  It is impertinent [sic] to me that we have this conversation privately before Antwane arrives on the campus Monday morning.  – Rebecca.

App. at 332-336 (Ex. D, Dep. Ex. 39).  Plaintiff contends the purpose of the meeting request was to discuss the Homecoming cash issue with President Sorrell and admits she did not tell Owens about the meeting request.  App. at 207 (Ex. D at 115:4-16).

President Sorrell, who was traveling at the time, did not receive or otherwise missed Plaintiff's November 11, 2011 text message.  App. at 54; 58-59; 70-71; 234 (Ex. B at 67:8-11; 75:14-16; 75:19-76:3; 100:15-101:9; Ex. D at 155:3-24).  On November 14, 2011, Plaintiff again texted President Sorrell about the Homecoming cash issue and again concedes she did not mention anything about fraud or FCA violations.  App. at 202-204; 342 (Ex. D at 110:10-112:12; 113:8-11, and Dep. Ex. 42).

Also on November 14, 2011, Plaintiff sent an e-mail to Owens asking if he could meet with her and he advised he was too busy but asked her what was going on.  App. at 208-209; 343 (Ex. D at 120:24-121:25, and Dep. Ex. 43).  On that same date, Plaintiff sent Owens an e-mail

advising, "FYI, it looks like our October spending for grant salaries was round $57k when you take out TADC."[7]  App. at 212-215; 349-350 (Ex. D at 126:16-129:6, and Dep. Ex. 45).  Owens responded, "Since you seem to be very concerned about this-how abt [sic] you do a spreadsheet that shows an [sic] the actual draws vs actual cash outlays by month and by grant from June through now – showing what we spent and when we got the cash in.  Is this something I can get by cob tmrw."  App. at 349-350 (Ex. D, Dep. Ex. 45).

Despite the fact Plaintiff claims the e-mail was related to her alleged investigation into fraud related to grant expenses, she had to ask Owens for assistance, which he provided, regarding the types of accounts she would need to review to locate the information she was seeking.  App. at 215 (Ex. D at 129:7-24).

On November 15, 2011, and during an e-mail exchange between President Sorrell and Plaintiff about a reimbursement check, President Sorrell told Plaintiff he had spoken to Owens about the Homecoming cash situation and was satisfied with Owens' answer.  Plaintiff responded as follows:

> Thank you for your response.  However, my desire to meet with you was not just in regarding to the Homecoming cash issue.  I understand that I am at fault of occasionally letting my concerns stem from a mole hill and turn into the size of a mountain.  Being said, I can understand your hesitancy in meeting with me when I express urgency.  **However, I am trying to alert your attention to something that I think *could be* a very serious risk for the college**.  I feel it is best to talk with you about this issue in person.  Please let me know when you will be available.

App. at 351-352 (Ex. D, Dep. Ex. 46) (emphasis added).  Once again, Plaintiff concedes she never used the words, "fraud" or "fraudulent claims" to alert President Sorrell to her alleged concerns about fraudulent conduct.  App. at 218 (Ex. D at 132:15-18).  President Sorrell responded to Plaintiff that he was out of town and asked her to meet with Price before Plaintiff

---

[7] "TADC" is an acronym for Texas Association of Developing Colleges, which provides scholarship funds.

met with him.  Plaintiff met with Price, who told Plaintiff to reduce any concerns she had to writing.  App. at 217-219; 443-444 (Ex. D at 131:6-133:13[8]; Ex. E at 209:6-210:6).  Price confirms Plaintiff did not report that Owens was committing fraud on the government.  To the contrary, Plaintiff told Price Plaintiff "was concerned about the timing of the administration of some grant funding."  App. at 446 (Ex. G at 18:3-22).

Also on November 15, 2011, Plaintiff e-mailed Warland and asked for assistance with determining how to compare actual draws on grants with cash outlays.  Even though Plaintiff had been working at PQC for over one year, Warland had to explain to Plaintiff how the grant accounting process worked.  App. at 220-221; 353-356 (Ex. D at 134:13-135:20, and Dep. Ex. 47-48).  Importantly, Warland told Plaintiff that Plaintiff was not looking at the correct information because there were not specific invoices attached to a particular draw; instead, it is a cumulative number.  App. at 480-481 (Ex. H at 80:12-81:25).

At nearly 9:00 p.m. on the evening of November 15, 2011, Plaintiff e-mailed Owens a spreadsheet of "what she was able to compile so far" related to grant draws.  Owens responded that he did not understand her work because her draw dates were inaccurate.  App. at 225-227; 367 (Ex. D at 144:9-146:7, and Dep. Ex. 54).  On that same evening, Plaintiff texted Owens asking if he could meet that night for coffee.  Owens declined but agreed to meet Plaintiff for coffee the next morning.  App. at 224; 357-365 (Ex. D at 142:6-25, and Dep. Ex. 52).  Although Plaintiff claims she wanted to discuss her perceived grant accounting issues with Owens, she did not tell him that before the meeting.

On the morning of November 16, 2011, Plaintiff and Owens met for coffee, and Owens told Plaintiff she would be out of a job at the end of the year and needed to start looking for new

---

[8] Plaintiff does not recall the specifics of this conversation.  App. at 137-138 (Ex. C at 132:23-133:9).

employment.  App. at 228-229; 453; 430-432 (Ex. D at 147:18-148:20; Ex. F at 94:9-12; Ex. E at 78:4-80:1).  Plaintiff understood her employment was being terminated but believed, without any factual support, that Owens lacked the actual authority to discharge her.  App. at 229; 233 (Ex. D at 148:7-20; 152:5-23).  Importantly, at no time during the meeting did Plaintiff accuse Owens of committing fraud on the government.  App. at 230 (Ex. D at 149:6-16).

Following the meeting, Plaintiff continued to e-mail Owens regarding her spreadsheet but at no time used the words, "fraud" or "False Claims Act" in her communications.  App. at 231-232; 369-371 (Ex. D at 150:11-151:23, and Dep. Ex. 57).

Later that same day, Owens provided President Sorrell with a memo recapping Owens' meeting with Plaintiff wherein he told her "that we would no longer be utilizing her services, starting in the New Year."  App. at 368; 453 (Ex. D, Dep. Ex. 56; Ex. F at 94:9-12).

5. **Plaintiff submits a written complaint to President Sorrell accusing Owens of engaging in various, fraudulent activities.**

On November 18, 2011, Plaintiff hand-delivered a memo she believes she typed on November 17 to President Sorrell in which she claimed, *inter alia*, that Owens made intentional misrepresentations to the federal government in securing grants for PQC (the "Complaint Memo").  App. at 235; 372-375 (Ex. D at 156:6-10, and Dep. Ex. 60).  The "Re" line of the Complaint Memo references "Actions Required to Address Fraudulent Actions, Dishonesty, and Retaliation," and subsection "b" on page 2 includes the following, specific retaliation allegation:

> After speaking with Ms. Warland, I met Mr. Owens for coffee Wednesday morning, November 16.  He criticized me for questioning him.  He told me that his and my relationship had deteriorated.  He said he expected to be at the college through March 2012 to train the new Chief Financial Officer, and he did not want me there during the time he was training that CFO, presumably to avoid my exposing Mr. Owens's wrongdoing to that CFO.  ***Mr. Owens told me that I should begin looking for other opportunities but that he would provide me with a recommendation and that I did not need to be gone as soon as two weeks. This action was in retaliation for my challenging and reporting of his violations***

> *of federal law and to avoid my continued investigation of and challenge to such violations.*"

App. at 372-375 (Ex. D, Dep. Ex. 60, at p. 2) (emphasis added).  Plaintiff concedes she never used the words, "fraud" "violating federal laws," "fraud on the government," or any similar words in any communications to Owens prior to her submission of the Complaint Memo.  To the contrary, she contends her vague beliefs that Owens was committing fraud were "inferred" by her communications.  App. at 237-238 (Ex. D at 160:10-161:18).

On November 20, 2011, and at President Sorrell's request, Price provided President Sorrell with a memo regarding her thoughts on Plaintiff's performance.  App. at 467-469; 475-476; 139-140 (Ex. G at 33:20-35:21, and Dep. Ex. 4; Ex. C at 149:9-150:10).  According to Price, Plaintiff's performance was substandard.

### 6. President Sorrell submits Plaintiff's complaint to PQC's Board and places Plaintiff and Owens on paid administrative leaves of absence pending an investigation conducted by outside counsel.

President Sorrell immediately notified the Board Chairman about the Complaint Memo and provided the Board with a copy.  App. at 61-62; 100-103 (Ex. B at 80:12-20, and Dep. Ex. 6).  Thereafter, President Sorrell was advised by the Board that it had hired the now defunct Dallas law firm of Bickel & Brewer to conduct an independent investigation into Plaintiff's allegations.  Other than providing information for the investigating counsel's use, President Sorrell did not lead or otherwise participate in the investigation, and was given no factual information about the investigation.   App. at 61-63; 75-77; 78-79; 124-126 (Ex. B at 80:11-20; 81:15-82:11; 106:23:108:1; 110:4-111:21; Ex. C at 34:11-35:21; 36:5-8).

President Sorrell asked Price for her input into Plaintiff's Complaint Memo, and also received a memo from Warland related to some of Plaintiff's allegations.  App. at 64-65; 74-75; 104-106; 482-484; 489 (Ex. B at 93:19-94:1; 94:3-10; 105:6-106:11, and Dep. Ex. 8-9; Ex. H at

129:18-131:25, and Dep. Ex. 11).   Neither Warland nor Price corroborated any of Plaintiff's allegations in the Complaint Memo, and Plaintiff concedes Mulherin never told her he believed Owens was committing fraud against the government. App. at 252 (Ex. D at 230:15-25). Additionally, no one from eCratchit ever contacted President Sorrell to report that Owens was allegedly committing fraud on the government.  App. at 135-136 (Ex. C at 57:14-58:3).

To ensure a smooth and unhampered investigation, and upon the advice of the Chairman of the Board, President Sorrell placed both Plaintiff and Mr. Owens on fully *paid* (including benefits for Plaintiff) administrative leaves of absence.   App. at 239-240; 375.001 (Ex. D at 163:15-164:22, and Dep, Ex. 61; Ex. E at 110:4-20; Ex. B at 81:10-18; Ex. C at 44:17-45:5). Plaintiff participated in the investigation by providing documents to and meeting with the Bickel & Brewer attorneys.  App. at 417-420 (Ex. E at 13:13-16:16).

In or around late January or early February 2012, and during a conversation with Don Clevenger ("Clevenger"), Chairman of the Board's Finance Committee, about the status of the search for a new CFO, President Sorrell learned that Bickel & Brewer had concluded the investigation and "they were not going to take any further action after that."  App. at 128-130; 133-134 (Ex. C at 38:22-40:9; 48:23-49:8).  The Board instructed President Sorrell to continue his search for a new CFO and keep Plaintiff on her paid administrative leave.  President Sorrell was not told or shown any results from or about outside counsel's investigation. App. at 61-63; 75-77; 787-79 (Ex. B at 80:11-20; 81:15-82:11; 106:23:108:1; 110:4-111:21).  Additionally, the Board did not share with him its rationale for keeping Plaintiff on paid leave at that time.  App. at 79-81; 84-85 (Ex. B at 111:9-21; 112:5-113:6; 116:13-117:5).[9]

---

[9] In his prior deposition, President Sorrell was asked to reveal the facts and conclusions reached by Bickel & Brewer and his counsel at the time instructed him not to answer based on the attorney-client privilege.  App. at 124-128 (Ex. C at 34:25-38:11).

**7.    Owens files a lawsuit against Musser and Musser counterclaims against Owens.**

Sometime around the end of January 2012, Owens told President Sorrell he wanted to sue Musser.  App. at 85-86 (Ex. B at 117:24-118:9). On February 13, 2012, Owens filed a lawsuit against Musser claiming that, in connection with the Complaint Memo, Musser had committed tortious interference with business relations, business disparagement, and breach of contract. App. at 242; 376-382 (Ex. D at 181:11-14, and Dep. Ex. 72).  According to Musser, PQC paid her legal bills for the case.  App. at 243 (Ex. D at 182:4-22).  On January 8, 2013, Plaintiff filed a counterclaim against Owens alleging libel and libel per se and slander and slander per se.  App. at 245; 393-397 (Ex. D at 188:13-20, and Dep. Ex. 79).

**8.    Owens joins PQC as a defendant in his lawsuit against Musser and PQC advises Plaintiff that her pending termination is effective August 31, 2014.**

On August 6, 2013, Owens filed his Third Amended Original Petition adding PQC as a defendant to his lawsuit against Plaintiff.  App. at 246; 398-406 (Ex. D at 189:13-18, and Dep. Ex. 81).   Owens' claims against PQC included vicarious liability, business disparagement, defamation per se, and libel per se (Owens' original claims against Plaintiff, Plaintiff's counterclaims against Owens, and Owens' claims against PQC are collectively referred to herein as the "Owens Lawsuit").  On January 23, 2014, Plaintiff and Owens settled their claims against one another.  App. at 247; 407-408 (Ex. D at 191:23-24, and Dep. Ex. 85).

On April 21, 2014, the Court entered a Final Judgment for PQC on PQC's Motion for Rule 166 Conference to Determine Remaining Matters of Law, or in the Alternative, Motion for Rule 175 Determination of Issue of Law, effectively ending the Owens Lawsuit.  App. at 5 (Ex. A at ¶ 18).

Sometime in mid-2014, President Sorrell spoke to the Board as part of an ongoing (meaning since 2011) conversation about streamlining the staff and eliminating positions to save money.  App. at 87 (Ex. B at 129:11-24).  Notwithstanding the fact PQC had already terminated Plaintiff's employment, and even though her actual last day of employment had been placed on hold due to the impending investigation and the Owens Lawsuit, President Sorrell concluded PQC did not need the position of Controller and that Plaintiff's functions had been absorbed by eCratchit.  App. at 88-90; 91-92 (Ex. B at 131:1-19; 132:1-133:23; 140:11-141:16).

Also in 2014, President Sorrell spoke with Bishop Vashti McKenzie, PQC's new Board Chairwoman, regarding allowing Plaintiff's 2011 termination to stand, and to President Sorrell's recollection, the Bishop did not object to the request.  App. at 96-97 (Ex. B at 155:11-156:9)

On or about August 18, 2014, Price sent Plaintiff a letter advising that Plaintiff's administrative leave had ended and her termination would now be effective August 31, 2014. Price also advised that the business office had been reorganized and the position of Controller had been eliminated.  App. at 249; 409; 93; 107 (Ex. D at 194:8-22, and Dep. Ex. 88; Ex. B at 150:4-18, and Dep. Ex. 14).  At no time between November 16, 2011 through August 18, 2014 did President Sorrell revoke or withdraw the original decision to terminate Plaintiff's employment. App. at 94 (Ex. B at 151:13-15).

**9.**     **Plaintiff never reports the alleged fraud to the government, PQC's auditors do not cite PQC for grant accounting fraud, and PQC finally hire a new CFO.**

Despite her allegedly strong belief that Owens was committing fraud against the government related to PQC's grant fund accounting, Plaintiff never reported PQC to any government agency or filed a Qui Tam action. App. at 4 (Ex. A at ¶ 15).  In fact, PQC is required by law to submit to an annual audit by an outside auditor and provide the results to the federal

government, and at no time during President Sorrell's tenure has any outside auditor or governmental agency advised PQC that it was committing fraud against the government related to the grant accounting. App. at 4; 29; 122-123 (Ex. A at ¶ 16; Ex. B at 32:19-24; Ex. C at 31:10-32:11).  In August 2014, PQC finally hired a full-time CFO, and to date, PQC has never filled the Controller position.  App. at 3 (Ex. A at ¶¶ 8, 17).

> **10.** **Plaintiff files this lawsuit against PQC alleging FCA retaliation.**

On August 16, 2017, and despite the fact she raised the retaliation issue in the Owens Lawsuit, Plaintiff filed the above-captioned lawsuit against PQC alleging one count of FCA retaliation. App. at 410-414 (Ex. D, Dep. Ex. 103).

## ARGUMENT AND AUTHORITIES

> **1.** **Summary Judgment Standard.**

A court must enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is "material" if its resolution in favor of one party might affect the outcome of the lawsuit under governing law.  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (additional quotation omitted).  To show the existence of a genuine dispute, the nonmoving party must support its position with citations to particular parts of materials in the record, including, *inter alia*, depositions, documents, and admissions.  Fed. R. Civ. P. 56(c).  A court must resolve factual controversies in favor of the nonmoving party provided that those controversies are more than conclusory allegations, unsubstantiated assertions, or a scintilla of evidence.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

2.      **Applicable Law.**

a.      ***PQC's use of prior deposition testimony.***

In support of this Motion, PQC relies on deposition testimony from Plaintiff, President Sorrell, Owens, Price, and Warland secured in the Owens Lawsuit.  PQC contends the testimony is admissible in this summary judgment proceeding under both Rules 32(a)(8) and 56(c)(2) of the Federal Rules of Civil Procedure.

Rule 32(a)(8) generally provides that a deposition lawfully taken may be used in a later action involving the same subject matter between the parties, or their representatives or successors in interest, to the same extent as if taken in the later action.  Significantly, a total identity of the parties is not required, and the "same party" rule has been construed liberally in light of the twin goals of fairness and efficiency.  *Runge v. Stanley Fastening Sys., L.P.*, No. 4:09-CV-00130-TWP-WGH, 2011 U.S. Dist. LEXIS 147924, *7-8 (S.D. Ind. Dec. 23, 2011) (additional citations omitted).  Plaintiff, Owens, and PQC were the parties to the Owens Lawsuit and all three parties were represented by counsel during the various depositions.  Plaintiff and PQC are parties to the present lawsuit.  Both lawsuits involve(d) accusations of wrongdoing related to the Complaint Memo, and Plaintiff raised the issue of retaliation in the earlier suit.  For these reasons, Rule 32(a)(8) permits PQC to use the prior deposition testimony.

Additionally, and in the alternative, pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment evidence need not presently be in a form admissible at trial; rather, it must be capable of "being presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).  Even if a deposition transcript does not meet Rule 32's requirement, it may still be considered under Rule 56 for summary judgment purposes as if it were a sworn

affidavit. *Bingham v. Jefferson County*, No. 1:11-CV-48, 2013 U.S. Dist. LEXIS 45826, at *19-20 (S.D. Tex. March 1, 2013).[10]

###### b.    *The FCA.*

The purpose of the FCA is to combat fraud against the government. *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994).   The FCA's retaliation provision provides in full:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, emoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).

The FCA's whistleblower protection protects employees who take steps to uncover and report an employer's fraudulent submission of claims to the government. *Jamison v. Fluor Fed. Sols., L.L.C.*, No. 3:16-CV-0441-B, 2017 U.S. Dist. LEXIS 118580, *10 (N.D. Tex. July 28, 2017).

###### 3.    <u>Plaintiff's retaliation claim is barred by the statute of limitations.</u>

Pursuant to 31 U.S.C. § 3730(h)(3), "A civil action under this subsection may not be brought more than 3 years after the date when the retaliation occurred."   An action brought under § 3730(h) accrues "when the retaliation occurred."  31 U.S.C. § 3730(h)(3); *Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 419, 125 S. Ct. 2444, 162 L Ed. 2d 390 (2005); *Weslowski v. Zugibe*, 14 F. Supp. 3d 295, 303 (S.D.N.Y. 2014); *Ross v. Bob*

---

[10] Plaintiff testified under oath in her 2018 deposition that everything she said in her 2013 deposition was true and correct and that PQC could rely on that testimony in this case.  App. at 230-231; 253 (Ex. D at 149:17-150:3; 231:16-22).

*Dean Enters.*, No. 10-287 Section "G" (3), 2013 U.S. Dist. LEXIS 12486, *5 (E.D. La. Jan. 30, 2013).

In the Complaint Memo Plaintiff submitted to President Sorrell on November 18, 2011, Plaintiff admitted she believed she was retaliated against when she was terminated effective December 31, 2011.  App. at 372-375 (Ex. D, Dep. Ex. 60, at p. 2).  Plaintiff testified she believed the retaliation occurred when Owens told her she would no longer have a job at year's end:

> Q.    Direct your attention to page 2 of the [Complaint] [M]emo.
> A.    Yes.
> Q.    Middle of the page, you have a section B, (as read) Mr. Owens refusal to comply with law and retaliation; is that correct?
> A.    Yes.
> Q.    What was the retaliation?
> A.    Him telling me on that Wednesday that I needed to look for another—that they were bringing another CFO in.  He didn't want me to be there.

App. at 236; 372-375 (Ex. D at 158:15-24, and Dep. Ex. 60).

To the extent Plaintiff's counsel attempts to argue that Plaintiff's actual termination occurred on August 19, 2014 (the date of Price's letter advising of the end of Plaintiff's administrative paid leave) or August 31, 2014 (the new effective date of Plaintiff's termination), and therefore, her lawsuit filed on August 16, 2017 is timely, they are incorrect for two reasons.  First, case law is clear that retaliation occurs *at the time notice of termination is given*, even if the effective date of the termination is later.  *See Weslowski*, 14 F. Supp. 3d at 303 ("The Court finds nothing conditional about the November 24 termination notice, even if the effective date of resignation was December 4, and his claim therefore began to accrue on [November 24]"); *Chardon v. Fernandez*, 454 U.S. 6, 8, 102 S. Ct. 28, 70 L. Ed. 2d 6 (1981) (plaintiffs were notified, when they received their letters, that a final decision had been made to terminate their

appointments.  "The fact they were afforded reasonable notice cannot extend the period within which suit must be filed."); *Shockley v. VT. State Colls.*, 793 F.2d 478, 481-82 (2d Cir. 1986) (noting that generally, the timeliness of a discrimination claim is measured from the date the claimant receives notice of the alleged discriminatory act, not the date the decision takes effect).

Second, Plaintiff admitted on two, separate occasions that she believed the retaliatory act occurred on November 16, 2011 when Owens told her she would be out of a job at the end of 2011.  She made the first admission in a June 4, 2012 response to a request for disclosure in the Owens Lawsuit wherein she claimed, "Any actions taken by Musser were further justified because she was exercising her own legal rights and/or making a good-faith claim to a colorable legal right.  Owens was attempting to retaliate against Musser in violation of the False Claims Act, and Musser sought to stop Owens from engaging in such retaliation."  App. at 383-392 (Ex. D, Dep. Ex. 74).  Regarding the disclosure statement, Plaintiff admitted the alleged retaliation occurred in November 2011:

> Q.   (BY MS. VOLTMER.  Exhibit 74, and was Mr. Hill your lawyer in the lawsuit that Mr. Owens filed?
> A.   Yes.
> Q.   74, these are responses to plaintiffs' request for disclosure?
> A.   Okay.
> Q.   Correct?
> A.   Yes.
> Q.   So these are your responses?  Yes?
> A.   Yes.

App. at 243-244 (Ex. D at 182:24-183:8).

*               *               *

> Q.   Four paragraphs down, second sentence in the fourth paragraph reads, (as read) Owens was attempting to retaliate against Musser in violation of the False Claims Act—
> A.   Yes.
> Q.   ---correct?
> A.   Yes.

> **Q.** **So you believed in 2012, as you stated also in your November 18, 2011 memo, that you believed you were being retaliated against?**
> **A.** **Yes.**

App. at 244-245 (Ex. D at 183:16-184:1) (emphasis added).  She made the second admission during her deposition testimony in this case:

> **Q.** (BY MS. VOLTMER) Okay.  I don't want to know anything that you discussed with your lawyer.  I want to know why you made a decision in 2017 to file a lawsuit against Paul Quinn College?
> **A.** 'Cause I was wrongfully terminated over reporting government fraud.
> **Q.** And what facts and circumstances to you base that contention on?
> MS. DIXON:  Objection, form.
> MS. VOLTMER:  What's the basis for that, asking her to explain her—her—
> MS. DIXON:  You asked for the facts and the evidence that she has to support—
> MS. VOLTMER:  I didn't say evidence.  I said circumstances.
> MS. DIXON:  But it's basically asking her what facts do you have to support your lawsuit.  And she's not an attorney and she's not somebody who's familiar, as you have already asked her, she's not an attorney and she's not somebody who knows exactly what facts and circumstances support her lawsuit.
> **Q.** (BY MS. VOLTMER) Do you know—do you have any facts or circumstances?  Are you aware of any, as you sit here today, for why this lawsuit was filed?
> **A.** Yes.
> **Q.** Can you share those with me?  And again, I don't want to know anything you discussed with counsel.  I just want to know your—
> **A.** The termination notice I was given.
> **Q.** The termination notice you were given?
> **A.** The notice from November…[11]

App. at 251-252 (Ex. D at 210:5-211:10).

Plaintiff has not made any tolling arguments and cannot credibly contend she did not believe the termination notice Owens gave her on November 16, 2011 was false or otherwise ineffective.  While PQC admits there was a lengthy gap, between the November 16, 2011 notice

---

[11] After admitting it was the November 2011 notice of discharge, Plaintiff then changed her answer to claim it was the 2014 termination notice.

of termination and the termination date of August 31, 2014, which was punctuated by an outside investigation and contentious litigation between and among Plaintiff, Owens, and PQC, PQC did not withdraw or overturn Plaintiff's termination in the interim, and PQC 's counsel could find no case law that negates the original notice date.

### 4.   Plaintiff cannot establish *a prima facie* case of retaliation.

To establish a claim for FCA retaliation, Plaintiff must show: (1) she participated in a protected activity; (2) PQC was aware she engaged in the activity; and (3) she was discriminated against as a result of participation in the activity. *U.S. v. Solvay Pharms., Inc.*, 871 F.3d 318, 332 (5th Cir. 2017); *U.S. ex rel. George v. Bos. Sci. Corp.*, 864 F. Supp. 2d 597, 603-04 (S.D. Tex. 2012). If Plaintiff establishes a *prima facie* case, the burden shifts to PQC to articulate a legitimate, non-discriminatory reason for the termination. If PQC articulates such a reason, the burden shifts back to Plaintiff to show that the proffered reason for her termination was not the true reason but was a pretext for retaliation. To survive summary judgment, Plaintiff must point to evidence creating a genuine issue of material fact that her complaint was the but-for cause of her termination. *Solvay*, 871 F.3d at 332-33.

A plaintiff cannot show retaliatory discharge where her investigations were part of her job and she never characterized her concerns as involving illegal, unlawful, or false claims investigations. *Robertson*, 32 F.3d at 952. Put another way, "an employee's allegations that she complained about her employer's errors in performing a government contract are insufficient ***unless the employee specifically referred to fraudulent claims for payment for those services***, putting the employer on notice of potential FCA liability." *U.S. ex rel. Ligai v. ETS-Lindgren Inc.*, No. H-11-2973, 2014 U.S. Dist. LEXIS 129164, *45 (S.D. Tex. Sept. 16, 2014) (emphasis added); *U.S. ex rel. Phillips v. L-3 Communs. Integrated, Sys., L.P.*, No. 3:10-CV-1784-L, 2012

U.S. Dist. LEXIS 121272, *27-28 (N.D. Tex. Aug. 24, 2012) (court granted motion to dismiss where plaintiff failed to allege that he reported to his employer that he believed the employer was submitting fraudulent claims for payment to the government).

> **a.**      ***Plaintiff cannot establish that PQC had notice of her alleged fraud allegations before Owens made the decision to terminate her employment.***

"A successful [FCA] retaliation claim requires Defendant to have known Plaintiff engaged in a protected activity." *Jamison*, 2017 U.S. Dist. LEXIS 118580, at *14 (additional quotations and citations omitted). To satisfy the notice requirement, Plaintiff had to advise PQC or Owens she believed Owens *was committing fraud*. *See Robertson*, 32 F.3d at 951 ("In this case, [plaintiff] admitted that he never used the terms 'illegal,' 'unlawful,' or '*qui tam* action' in characterizing his concerns about Bell's charges…[a]s a result, we conclude that [Plaintiff's] reporting did not constitute protected activity under the False Claims Act."); *U.S. ex rel. Ruscher v. Omnicare, Inc.*, No. 4:08-CV-3396, 2014 U.S. Dist. LEXIS 79885, *74 (S.D. Tex. June 12, 2014) ("Both 'fraud' and 'against the government' are important. It is certainly not enough to merely complain of an employer's inefficiency or incompetence."); *Phillips*, 2012 U.S. Dist. LEXIS 121272, at *26 (for internal complaints to constitute protected activity, the complaints must concern false or fraudulent claims for payment submitted to the government).

At no time prior to her submission of the Complaint Memo to President Sorrell on November 18, 2011 did Plaintiff advise anyone at PQC, and specifically Owens or President Sorrell, that she believed Owens *was committing fraud against the government*. Even though Plaintiff claimed in her Complaint Memo that she "only recently discovered [violations of the law] and confronted Mr. Owens about it last Thursday, November 10," she reluctantly and

painfully conceded during her deposition that no such confrontation *involving fraud allegations*

occurred:

> Q.   (BY MS. VOLTMER) Hand you Exhibit 38.  This is an e-mail from you to Mr. Owens dated November 10, 2011, correct?
> A.   Yes.
> Q.   You asked (as read) do we need to back out AP amounts to Sunguard on the next grant draws since we haven't actually paid them yet?
> A.   Yes.

App. at 197; 331 (Ex. D at 104:12-20, and Dep. Ex. 38).

*          *          *

> Q.   Better question, would you agree with me that nothing in this e-mail advises him that you think it's being done inaccurately?
> A.   No.
> Q.   Show me where you say it's being done inaccurately.  What words do I need to look at?
> A.   ***I don't use the words specifically inaccu—I don't use the words specifically, but it's inferred.***

App. at 198-199 (Ex. D at 105:22-106:4) (emphasis added).

*          *          *

> Q.   (BY MS. VOLTMER) Is there anything ---I want to make sure that my question is very specifically answered.  ***Do you use the word fraud in this e-mail?***
> A.   ***No.***
> Q.   ***Do you use the words fraud on the government, the phrase?***
> MS. DIXON:  OBJECTION.
> A.   ***No.***
> Q.   (BY MS. VOLTMER) Do you use the words inappropriate?
> A.   No.

App. at 199-200 (Ex. D at 106:19-107:4) (emphasis added).

*          *          *

> Q.   (BY MS. VOLTMER) Did you ask him if he interpreted this as being an accusation of fraud?
> A.   No.
> Q.   Did you know what was in his head when he received this e-mail?
> A.   No.

> Q.      So you're guessing at what he should have interpreted, is that fair?
> A.      I wouldn't say I was guessing.   I would say, based on circumstances at the nature of this e-mail, that he was aware that I was pointing out that these were not being done correctly.
> Q.      ***You didn't tell him directly you thought---or excuse me, you didn't tell him directly you were accusing him of fraud; is that fair?***
> A.      ***Correct.***

App. at 201 (Ex. D at 108:5-22) (emphasis added).  Plaintiff has repeatedly testified she does not ever recall telling Owens, prior to the submission of the Complaint Memo, that he was engaging in any illegal or fraudulent activity in violation of federal law.  App. at 230; 438-440 (Ex. D at 149:6-24; Ex. E at 177:12-179:18).  Further, regardless of how Plaintiff characterizes her own conduct (and she's had over six years to reflect on the matter), it is clear she never used the words and/or phrases, "fraud," "fraud against the government," or anything remotely similar in any writings (or orally) before November 18, 2011 that would have placed PQC on notice that she was complaining about alleged fraud against the government.  App. at 234-235; 216-217; 331-336; 341-348; 351-352; 357-365; 367; 369-371; 443-444; 455-456 (Ex. D at 155:3-156:4; 130:8-131:4, and Dep. Ex. 38-39, 41-44, 46, 52, 54, 57; Ex. E at 209:11-210:6; Ex. F at 157:13-158:2).[12]

Plaintiff's undeniable failure to put PQC on notice she was complaining of fraud against the government before Owens made the termination decision warrants summary judgment for PQC.  *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 883 (5th Cir. 2003) (to establish the causation prong, the employee must demonstrate that the employer knew about the employee's protected activity).

---

[12] Price also confirms Plaintiff "said she [Plaintiff] was concerned about the timing of the administration of some grant funding."  App. at 464 (Ex. G at 18:11-22).

b.    *Plaintiff cannot establish causation.*

Similarly, even if the Court determined Plaintiff's cryptic, vague comments ("I am trying to alert your attention to something that I think could be a very serious risk for the college"; "I have some important information that I need to share with you…")[13] qualify as protected activity under the FCA, Plaintiff's retaliation claim nevertheless fails because it is undisputed Owens and Sorrell made the termination decision prior to their receipt of or knowledge about the Complaint Memo.  "If the decisionmakers were completely unaware of the plaintiff's protected activity, then it could not be said (even as an initial matter) that the decisionmakers might have been retaliating against the plaintiff for having engaged in that activity."  *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 883 n.6 (5th Cir. 2003); *Wiley v. Am. Elec. Power Serv. Corp.*, 287 Fed. Appx 335 *11 (5th Cir. July 17, 2008) (unpublished) ("Without knowledge of the complaints, there cannot be a causal connection between the plaintiffs' complaints and the subsequent termination.").

President Sorrell's testimony as to the timing of the decision is undisputed:

> A.    Well, it was---so Re—the initial conversation about Rebecca being terminated took place when Antwane and I were in Nashville in early November.  And so as all of this rolled down the hill, you know, the ---my one contribution to the board was that, you know, the memo—Rebecca's memo came after she was informed she was going to be terminated.

App. at 81-82 (Ex. B at 113:20-114:1). Owens' testimony that he did not see the Complaint Memo until November 20, 2011 is also undisputed.  App. at 452 (Ex. F at 39:10-40:7).

PQC anticipates Plaintiff will challenge what amounts to a fatal timing issue for her by claiming that the termination decision could not have been made before she submitted the

---

[13] App. at 332-336; 351-352 (Ex. D, Dep. 39, 46).

Complaint Memo to President Sorrell because there are no documents that support President Sorrell's testimony about the timing of the decision, even though President Sorrell testified that typically, PQC would document a termination decision at the time the termination became effective.  App. at 69 (Ex. B at 99:5-17).

This argument is baseless for two reasons.  First, Owens' November 16, 2011 memo to President Sorrell references an earlier conversation in Nashville, TN related to the decision to terminate Plaintiff.  Both the TRACS conference and the November 16, 2011 memo date fall *before* the date of the Complaint Memo.  Third, an employer's "failure to follow its own policy is not probative of discriminatory animus in the absence of proof that the plaintiff was treated differently than other[s]."  *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 346 (5th Cir. 2007).  Here, Plaintiff fails to identify anyone who was treated differently.

Succinctly stated, PQC could not have retaliated against Plaintiff because it made the termination decision before she engaged in any alleged, protected activity.

### 5. **PQC can articulate legitimate, non-discriminatory reason(s) for the discharge decision.**

Even if Plaintiff could establish a *prima facie* case of retaliation, which PQC strenuously denies, PQC can establish a legitimate, non-discriminatory reason for the discharge decision made in early November 2011.  As discussed above, Plaintiff cannot deny she was counseled and reprimanded by Owens and President Sorrell prior to November 18, 2011.  Case law is well-settled that poor performance, including a lack of confidence in an employee's ability to satisfactorily perform her job, as well as a planned reorganization (mentioned in Owens 11/16/18 memo), are legitimate, non-discriminatory reasons for a discharge*.   Valdez v. San Antonio Chamber of Commerce,* 974 F.2d 592, 596 (5th Cir. 1992) (poor job performance is a legitimate, non-discriminatory reason for discharge); *Kelly v. Dallas County Cmty. Coll. Dist.,* No. 3:16-

CV-0871-C, 2017 U.S. Dist. LEXIS 215644, *17 (N.D. Tex. July 28, 2016) (Cummings, J.) (a business reorganization is a legitimate, non-discriminatory reason for discharge); *Diaz v. FRB of Dallas*, No. EP-14-CV-227-KC, 2015 U.S. Dist. LEXIS 93791, *21-26 (S.D. Tex. July 20, 2015) (A loss of confidence in the plaintiff's ability to perform her job duties is a legitimate, non-discriminatory reason for discharge).

Even if the Court were to disregard the November 16, 2011 notice Owens gave to Plaintiff regarding the end of her employment on December 31, 2011 and decide Price's August 18, 2014 letter to Plaintiff constituted the actual termination notice date, the result would not change because the elimination of a position and its absorption by other individuals is also a legitimate, non-discriminatory reason for discharge. *Garnica v. Zale Lipshy Univ. Hosp.*, No. 3:03-CV-0637-P, 2004 U.S. Dist. LEXIS 29028, *9-10 (N.D. Tex. Feb. 10, 2004).

### 6. <u>Plaintiff cannot establish pretext.</u>

An employee seeking to show pretext must rebut each discrete reason proffered by the employer. *See Jackson v. Watkins*, 619 F.3d 463, 467 (5th Cir. 2010); *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 351 & n.16 (5th Cir. 2005). Plaintiff has no credible, material evidence to establish pretext.

To the extent Plaintiff simply disagrees with the performance assessments by Owens and President Sorrell, her disagreement cannot establish pretext because the pretext inquiry is limited to whether the employer believed the performance issues in good faith and whether the decision to discharge the employee was based on that belief. *Waggoner v. City of Garland*, 987 F. 2d 1160, 1165-66 (5th Cir. 1993). There is no evidence in this record to establish that President Sorrell and Owens did not believe the performance issues they repeatedly raised with Plaintiff.

If Plaintiff attempts to argue that an alleged lack of documentation regarding her discharge establishes pretext, the argument fails because "it is not sufficient for [plaintiff] to point to the lack of documentation produced by [employer]; rather, to rebut [employer's] reasons, she was required to provide evidence demonstrating the falsity of each of [employer's] reasons." *Mire v. Tex. Plumbing Supply Co.*, 286 Fed. Appx. 138, *143-44 (5th Cir. July 10, 2008) (unpublished). *See also, Diaz*, 2015 U.S. Dist. LEXIS 93791, at *28 ("the Fifth Circuit has held that a lack of documentation alone does not suffice to create a genuine issue of material fact at the summary judgment stage."). Here, Plaintiff has no evidence of positive performance reviews, public praises from PQC management, or any other documentation to establish that the numerous performance issues undeniably documented by Owens and President Sorrell were manufactured, and her subjective belief that her performance was satisfactory is insufficient to raise a fact issue on the legitimacy of PQC's proffered reason(s) for her discharge. *Mire*, 286 Fed. App'x 138, at *143-44.

PQC also notes that if Plaintiff argues that her actual termination notice date was August 18, 2014, she cannot establish pretext due to the lack of temporal proximity between her allegedly protected activity in 2011 and her discharge in 2014.

If Plaintiff argues she can establish pretext because PQC did not follow a progressive discipline policy related to her termination, the argument fails because PQC did not have a mandatory progressive disciplinary policy. App. at 268-318 (Ex. D, Dep. Ex. 20, at pp. 21-22). Moreover, Owens did in fact reprimand and counsel Plaintiff about her performance and behavior. App. at 95 (Ex. B at 154:11-24).

Finally, and in light of the foregoing, it defies logic to conclude PQC harbored a retaliatory motive when it is undisputed PQC took immediate action to investigate the Complaint

Memo, placed and kept Plaintiff on a fully paid leave of absence (during which time she traveled extensively, had cosmetic surgery, and sat at home watching television[14]), and paid for her legal bills in the Owens Lawsuit.  These are hardly the actions of an entity with a retaliatory motive.

In short, Plaintiff cannot establish that but-for her November 18, 2011 Complaint Memo, PQC would not have terminated her employment.

## CONCLUSION AND PRAYER

In light of Plaintiff's admission that she believed Owens' November 16, 2011 notice of her termination constituted retaliation under the FCA, this lawsuit, filed approximately six years later *and* after Plaintiff was involved in lengthy litigation with PQC and Owens regarding the Complaint Memo (wherein she also claimed he retaliated against her in November 2011) is untimely and candidly frivolous.  Plaintiff never reported to anyone at PQC that she believed Owens was committing fraud on the government until after Owens notified her of her impending discharge.  While she may disagree with PQC's assessment of her poor performance, the facts cannot and do not support a claim for retaliation under the FCA.

For the reasons set forth herein, PQC asks the Court to enter an order granting this Motion in its entirety; entering a take nothing judgment for Plaintiff; awarding PQC its reasonable costs in defending against this frivolous action; and awarding any further relief to which it may be entitled.

---

[14] App. at 428-429; 250; 248-249 (Ex. E at 74:19-75:22; Ex. D at 195:12-16; 193:24-194:6).

Respectfully submitted,

**GREENBERG TRAURIG, LLC**


By:   /s/ *Alicia Sienne Voltmer*
     Alicia Sienne Voltmer
     Attorney-in-Charge
     Texas Bar No. 00797605
     Voltmera@gtlaw.com
     2200 Ross Avenue, Ste. 5200
     Dallas, Texas 75201
     Tel.:   (214)-665-3600
     Fax:   (214)-665-3601

     **ATTORNEYS FOR DEFENDANT**
     **PAUL QUINN COLLEGE**

## <u>CERTIFICATE OF SERVICE</u>

On September 21, 2018, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

 /s/  *Alicia Sienne Voltmer*
Alicia Sienne Voltmer